PEOPLE v WATTS

Docket No. 78951. Submitted June 26, 1985, at Detroit.—Decided
March 3, 1986. Leave to appeal applied for.

David Watts was charged in Wayne Circuit Court with man-
slaughter and assault with intent to do great bodily harm less
than murder. On the day before the trial was scheduled to
begin, the prosecuting attorney notified defendant's attorney
that he intended to re-charge defendant with second-degree
murder, but would accept a plea to manslaughter. Defendant
refused to plead guilty to manslaughter. The manslaughter and
assault charges against defendant were dropped and he was
charged with second-degree murder. Defendant moved for dis-
missal of the charge on the ground of prosecutorial vindictive-
ness, but the motion was denied, Maureen Pulte Reilly, J.
Defendant was then tried, found guilty of manslaughter, and
sentenced, Robert J. Colombo, Jr., J. Defendant appealed. *Held:*

1. The trial court did not err in denying defendant's motion
to dismiss the second-degree murder charge on the ground of
prosecutorial vindictiveness. There is no presumption of vindic-
tiveness on the part of the prosecutor and defendant offered no
evidence which would lead to an inference of actual vindictive-
ness.

2. The examining magistrate, in binding defendant over for
trial on the second-degree murder charge, did not violate the
corpus delicti rule.

3. The trial court erroneously instructed the jury in its

REFERENCES

Am Jur 2d, Appeal and Error §§ 545 *et seq.*

Am Jur 2d, Criminal Law §§ 481 *et seq.*

Am Jur 2d, Homicide §§ 1, 4, 10, 11, 42, 44, 45, 50, 51, 53, 167, 168,
284, 285, 432-434.

Modern status of the rules requiring malice "of forethought,"
"deliberation," or "premeditation," as elements of murder in the
first degree. 18 ALR4th 961

Homicide: duty to retreat where assailant is social guest on prem-
ises. 100 ALR3d 532.

What constitutes "immently dangerous" act within homicide stat-
ute. 67 ALR3d 900.

Duty to retreat where assailant and assailed shared the same living
quarters. 26 ALR3d 1296.

instructions on the duty to retreat. However, the error does not require reversal of defendant's conviction. The instructions given, read as a whole, correctly stated the law and fit defendant's theory of the case.

4. Defendant's remaining allegations of error do not merit reversal of his conviction.

Affirmed.

1. CRIMINAL LAW — PLEA BARGAINS — THREATS OF ADDITIONAL CHARGES.

A prosecuting attorney is not prohibited from carrying out a threat, made during plea negotiations, to bring additional charges against an accused who refuses to plead guilty to the offense originally charged.

2. HOMICIDE — CORPUS DELICTI.

Corpus delicti, as used in homicide cases, refers not to the body of the deceased, but to the body of the wrong—the loss sustained; in criminal homicide prosecutions, the delicti or essence of the wrong is the wrongful taking of a human life by a criminal agency.

3. HOMICIDE — CORPUS DELICTI.

The corpus delicti rule does not require, in criminal homicide prosecutions, independent proof of each and every element of the particular grade and kind of common-law or statutory criminal homicide charged as a condition of admissibility of a defendant's confession.

4. HOMICIDE — SECOND-DEGREE MURDER — CORPUS DELICTI — MALICE.

Evidence of malice need not be shown to establish the corpus delicti of second-degree murder.

5. HOMICIDE — MALICE.

Malice is the intent to kill, actual or implied, under circumstances which do not constitute excuse or justification or mitigate the degree of the killing to manslaughter.

6. HOMICIDE — INTENT TO KILL — IMPLIED INTENT.

The intent to kill may be implied where the actor actually intends to inflict great bodily harm or the natural tendency of his behavior is to cause death or great bodily harm.

7. HOMICIDE — MURDER — ILL WILL.

A killing may be murder even though the actor harbored no ill

will against the victim and even though he acted on the spur of the moment.

8. Criminal Law — Jury Instructions — Preserving Question.

An error in jury instructions is not waived by a defendant's failure to object to the instructions where the trial court improperly instructed the jury on the law of the case.

9. Homicide — Defenses — Self-Defense — Retreat — Residences.

A victim of an attack has no duty to retreat before defending himself when attacked in his own home.

10. Criminal Law — Jury Instructions — Manslaughter — Appeal.

Reversal of a defendant's conviction for manslaughter is not warranted where, although the trail court erroneously instructed the jury on the defendant's duty to retreat when attacked in his own home, the instructions given, when read as a whole, correctly stated the law and fit the defendant's theory of the case.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Thomas M. Chambers,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Chari Grove),* for defendant on appeal.

Before: R. M. MAHER, P.J., and BRONSON and D. F. WALSH, JJ.

BRONSON, J. Defendant was charged with manslaughter, MCL 750.321; MSA 28.553, and assault with intent to do great bodily harm less than murder, MCL 750.84; MSA 28.279. Trial was scheduled for September 10, 1981. On September 9, the prosecutor notified defendant's attorney that he intended to re-charge the defendant with second-degree murder. He further stated that he would accept a plea to manslaughter. The defen-

dant did not wish to plead guilty, and on September 10, 1981, the former charges were dismissed and defendant was rearrested and charged with second-degree murder, MCL 750.317; MSA 28.549. Defendant moved for dismissal of the charge due to prosecutorial vindictiveness. A hearing was held in Wayne County Circuit Court on April 23 and May 7, 1982, before Judge Maureen P. Reilly, who denied the defendant's motion. Defendant's application for leave to appeal Judge Reilly's decision was denied by this Court on January 20, 1983 (Docket No. 67825, unpublished).

Defendant was tried by a jury on July 27 through August 3, 1983, in Wayne County Circuit Court. A mistrial was granted when the jury was unable to reach a verdict. Defendant was then tried by a second jury and before a different circuit court judge on February 6 through 14, 1984. Defendant was found guilty of manslaughter and sentenced, on March 27, 1984, to from 3 to 15 years. He now brings this appeal as of right.

Defendant's conviction resulted from the death of Clifton Bivens on July 13, 1981, at 303 West Buena Vista in Highland Park. Emergency medical personnel found Bivens at that address suffering from a severe head wound. He and a woman, Felda Lindsey, were transported to Ford Hospital. Bivens died as a result of a fractured skull caused by a blow to the back of the head with a blunt instrument.

On July 14, 1981, the defendant came to police headquarters with Felda Lindsey's mother and was arrested. He gave the police a statement in which he stated that he and Lindsey had argued and that he decided to leave and take his stereo with him. Lindsey threatened him with a knife and then hit him with a baseball bat. He grabbed the bat and pushed her, and Clifton Bivens ran

around the table toward him. He stated that he had told Bivens to stay back, that Bivens wouldn't, and that he struck Bivens with the bat and then struck him again when he tried to get up. Defendant then pushed Lindsey out on the porch and left the house. The defendant further stated that he had heard that Bivens carried a pistol and had "done other shootings and fightings". He stated that Bivens had tried to take the bat from him and that he had hit Bivens two or three times.

There were two preliminary examinations in this case. The second preliminary examination was held when defendant was re-charged with second-degree murder on September 22, 1981. Felda Lindsey testified that she and the defendant were arguing and that she hit him with a bat. She testified that the defendant took the bat. She saw Clifton Bivens with a chair in his hands and saw him coming at the defendant. She saw the defendant and Bivens struggling, but did not say she saw the defendant swing the bat. She did not recall her statement to police and could not say what had caused Bivens' death, except that he "jumped into a fight he shouldn't have jumped into". Judge Garian reminded the witness of her testimony in the earlier preliminary examination and noted that her testimony had changed. A recess was taken, during which the judge read the transcript of the earlier preliminary examination. He recalled that the witness had testified previously that she had seen the defendant strike Bivens with the bat. Defendant's statement and answers to questions were then admitted. Judge Garian found that there was sufficient evidence to bind the defendant over on second-degree murder charges.

At trial, Felda Lindsey testified that Clifton Bivens was her former boyfriend, but that there

was no animosity between him and the defendant. On the day of the killing, she described the argument between herself and the defendant, defendant's threat to leave and take a stereo component set she had considered her own, and admitted that she struck the defendant first with the bat. The defendant then grabbed the bat and pushed her. She stated that Bivens had picked up a chair and was backing up when the defendant turned on him with the bat. She stated that Bivens was coming around the dining room table. According to the witness, Bivens was using the chair defensively and did not swing it or come at the defendant. She saw the defendant hit Bivens in the head with the bat. Bivens had dropped the chair and had both hands up to his face when he was struck. She explained earlier inconsistent testimony by stating that she had been on medication and under psychiatric care. Defendant's statement was also admitted.

Defendant testified in his own behalf. He stated that he had no animosity toward Clifton Bivens. He testified that when he and Felda Lindsey began fighting, Bivens picked up a chair and came around the table at him. He thought Bivens was going to hit him with the chair and he told Bivens to stay back. When Bivens kept coming, the defendant began swinging the bat. He stated that he feared for his life and had no intent to kill Bivens. He did not specifically remember hitting Bivens, although he knew that he had swung several times and knew that Bivens had gotten hit. He denied the truth of the statements he had made to police that he had hit Bivens when he tried to get up or that he had hit him two or three times. He testified that he had not told police in his statement that Bivens had a chair because he had forgotten it until 1983.

Defendant first argues that his conviction must be reversed because the dismissal of the manslaughter charge and re-arrest on the second-degree murder charge constitutes prosecutorial vindictiveness and a denial of due process. According to defendant, the decision to re-charge came only after defendant refused to plead guilty to the charge of manslaughter and was motivated by a desire to punish defendant for exercising his right to trial. Defendant argues that we should apply a "presumption of vindictiveness", whereby the burden is on the prosecutor to objectively prove that the re-charging was justified. See *North Carolina v Pearce,* 395 US 711; 89 S Ct 2072; 23 L Ed 2d 656 (1969); *Blackledge v Perry,* 417 US 21; 94 S Ct 2098; 40 L Ed 2d 628 (1974). Two recent United States Supreme Court opinions convince us that a "presumption of vindictiveness" should not be applied in the instant case.

In *Bordenkircher v Hayes,* 434 US 357; 98 S Ct 663; 54 L Ed 2d 604 (1978), the Court considered an allegation of vindictiveness that arose in a pretrial setting. The Court held that due process did not prohibit a prosecutor from carrying out a threat, made during plea negotiations, to bring additional charges against an accused who refused to plead guilty to the offense originally charged. The prosecutor had explicitly told the defendant that if he did not plead guilty and "save the court the inconvenience and necessity of a trial", he would obtain an additional charge that would significantly increase the defendant's punishment. It was not disputed that the additional charge was justified by the evidence, that the prosecutor was in possession of the evidence at the time the original charge was made, and that the additional charge was brought because of the defendant's refusal to plead guilty.

In holding that no violation of due process occurred, the Court distinguished *Pearce, supra,* and *Blackledge, supra,* stating:

"In those cases the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction—a situation 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power.' * * * The Court has emphasized that the due process violation in cases such as *Pearce* and *Perry* lay not in the possibility that a defendant might be deterred from the exercise of a legal right, * * * but rather in the danger that the State might be retaliating against the accused for lawfully attacking his conviction. * * *

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, * * * and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.' * * * But in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer.

\* \* \*

"We hold only that the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." (Citations omitted.) 434 US 362-363, 365.

In *United States v Goodwin,* 457 US 368; 102 S Ct 2485; 73 L Ed 2d 74 (1982), the defendant was originally charged with a number of misdemeanors arising out of a traffic stop by a police officer. The defendant requested a jury trial and the case was transferred to the district court. After reviewing

the case, the defendant was recharged and ultimately convicted of a felony arising out of the same facts. The defendant argued on appeal that a presumption of vindictiveness should apply to the prosecutor's decision to recharge the defendant with a felony following his demand for a jury trial.

In rejecting the defendant's argument, the Supreme Court stated:

"There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins—and certainly by the time a conviction has been obtained—it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

\* \* \*

"[T]he timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted. A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct.[14] As we made clear in *Bordenkircher,* the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.

---

[14] We recognize that prosecutors may be trained to bring all legitimate charges against an individual at the outset. Certainly, a prosecutor should not file any charge until he has investigated fully

all of the circumstances surrounding a case. To presume that every case is complete at the time an initial charge is filed, however, is to presume that every prosecutor is infallible—an assumption that would ignore the practical restraints imposed by often limited prosecutorial resources." 457 US 381-382.

Given the Court's holdings in *Goodwin* and *Bordenkircher,* we decline to adopt a presumption of vindictiveness in the instant case. Therefore, in order to establish his claim of a denial of due process, defendant must affirmatively prove actual vindictiveness. *Goodwin, supra; Wasman v United States,* 468 US —; 104 S Ct 3217; 82 L Ed 2d 424 (1984).

At the hearing on his motion to dismiss, defendant offered no evidence which would lead to an inference of actual vindictiveness or the conclusion that defendant was being deliberately penalized for his failure to plead guilty. This was recognized by defense counsel who argued that, although no evidence of actual vindictiveness was submitted, a presumption of vindictiveness should nonetheless apply. Having declined to apply that presumption, we cannot say that the circuit court erred in denying defendant's motion.

Defendant next argues that the examining magistrate, in binding defendant over for trial, violated the corpus delicti rule. It is defendant's claim that the prosecutor could not and did not establish the element of malice necessary for second-degree murder without relying on defendant's statement given to the police at the time of his arrest.

In a very recent opinion, our Supreme Court had the opportunity to review the application of the corpus delicti rule in a murder case. *People v Williams,* 422 Mich 381, 391-392; 373 NW2d 567 (1985).

"In criminal homicide prosecutions, the delicti, or

essence of the wrong, is the wrongful taking of a human life, a criminal killing. The Legislature has distinguished between criminal homicides of differing types and varying severity of penalty by defining and denominating them as different crimes. Whether the killer took the deceased's life in sudden passion under provocation (manslaughter, MCL 750.321; MSA 28.553) or in circumstances showing that the killer at the time of the homicide entertained an intent to kill, or an intent to inflict great bodily harm, or an intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm would be the probable result (second-degree murder, MCL 750.317; MSA 28.549), or murdered the victim during the commission of a statutorily enumerated felony, or murdered by means of poison or lying in wait, or with deliberation and premeditation (first-degree murder, MCL 750.316; MSA 28.548), are all circumstances relevant to determine the seriousness of the homicide as measured by the maximum and minimum penalties fixed by the Legislature. *In all of the circumstances described above, however, and all the other various criminal homicides defined by the Legislature, the corpus delicti of the crime, the essential wrong, is the 'loss sustained'; the taking of a human life by a criminal agency.*

"It is an inaccurate and unwarranted reading of the history and purpose of the corpus delicti rule that suggests the need for independent proof of each and every element of the particular grade and kind of common-law or statutory criminal homicide charged as a condition of admissibility of a defendant's confession. Such an understanding of the corpus delicti rule loses sight of the historic reason for the rule; to avoid conviction for a homicide that did not occur. The logic of the rule is not served by extending it to require proof, *aliunde* the defendant's confession, not only that a particular deceased lost his life and that the loss is a result of criminal agency but, in addition, proof of the aggravating circumstances which move the seriousness of the crime up the scale of criminal accountability (measured by the severity of the penalty) from manslaughter to second-degree murder or to first-degree

murder. *Whatever the aggravating circumstances which constitute a crime, second-degree murder instead of manslaughter, or first-degree murder instead of second-degree murder, the danger that a defendant would confess to a criminal killing which never occurred is adequately obviated when it is shown, other than by the accused's confession, that the deceased victim died as a result of a criminal agency.*

"While it is surely critical to a defendant whether he is convicted of first-degree murder, second-degree murder, or manslaughter, given the differing penalties and related consequences, it does not follow therefrom that the danger that a criminal homicide conviction might be obtained where none was committed, requires evidence, in addition to the defendant's confession, of every element of the particular degree or grade of homicide charged." (Emphasis added.)

The Court held "that the corpus delicti of first-degree premeditated murder consists of two elements: the death of the victim and some criminal agency as the cause". *Id.*

We believe that *Williams* is equally applicable to the instant case. Defendant does not dispute that the prosecutor established, without reference to defendant's statement, that a death occurred as the result of some criminal agency. Defendant claims only that the element of malice, necessary to a successful prosecution for second-degree murder, was not shown. Under *Williams,* however, evidence of malice was unnecessary to establish the corpus delicti.

Further, we believe that sufficient evidence of malice was introduced. Malice is the intent to kill, actual or implied, under circumstances which do not constitute excuse or justification or mitigate the degree of the offense to manslaughter. The intent to kill may be implied where the actor actually intends to inflict great bodily harm or the natural tendency of his behavior is to cause death

or great bodily harm. *People v Morrin,* 31 Mich App 301, 310-311; 187 NW2d 434, *lv den* 385 Mich 775 (1971). Felda Lindsey's testimony, if believed by a jury, was sufficient to establish the element of malice. She testifed that Bivens was backing up with the chair in a defensive posture. At the time he was hit, according to her testimony, he no longer was holding the chair but had his hands up by his head. A killing may be murder even though the actor harbored no ill will against the victim and even though he acted on the spur of the moment. *Id.,* 311-312. A trier of fact could reasonably have found the element of malice implied by defendant's actions and the lack of justification required for second-degree murder. The prosecution presented a prima facie case sufficient to permit the introduction of defendant's statement.

Defendant next argues that the trial court erred in its instructions on the duty to retreat. While we agree that the court erroneously instructed the jury on this point, we do not believe the error warrants the reversal of defendant's conviction.

The trial judge instructed the jury as follows:

"The law requires a person to avoid using deadly force if he can safely do so. If the defendant could have safely retreated but did not do so, his failure to retreat is a circumstance which you may consider together with all other circumstances in determining whether he went further in repelling the danger than he was justified in doing.

"However, if the defendant believed that he was in imminent danger of death or serious bodily harm and that deadly force was immediately necessary to repel such danger, he was not required to retreat or to consider whether he could safely retreat. He was entitled to stand his ground and use such force as he believed immediately necessary to protect his person.

"A person who is assaulted while in his own house is under no obligation to try to escape, but may stand his

ground and repel the attack with as much force as appears necessary for the defense of his person."

This instruction was based on CJI 7:9:02 and CJI 7:9:03. These two instructions are intended to be alternatives. One or the other should be given with CJI 7:9:01, which was also given by the court in this case. The use note to CJI 7:9:02 directs that it not be used if the act occurred in the defendant's home. The instruction was a correct statement of law, but was inapplicable to the facts in the instant case. Although the defendant did not object to the instructions as given, review by this Court is not precluded. *People v Lenkevich,* 394 Mich 117, 123; 229 NW2d 298 (1975). Error is not waived when a trial judge improperly instructed the jury on the law of the case. *People v Kohler,* 113 Mich App 594, 599; 318 NW2d 481 (1981).

It is well settled that a defendant has no duty to retreat in her or his own home. *People v Lenkevich, supra.* In *People v Mroue,* 111 Mich App 759; 315 NW2d 192 (1981), it was held that the giving of CJI 7:9:02, coupled with the omission of CJI 7:9:03, was erroneous. However, in *People v Choate,* 88 Mich App 40; 276 NW2d 862, *lv den* 406 Mich 940 (1979), another panel of this Court reviewed a similar case in which CJI 7:9:02 was given and CJI 7:9:03 omitted and found no error. In that case, defendant was in his own home and shot a man he claimed was aiming a shotgun towards himself and others inside. Referring to the second part of CJI 7:9:02, the Court stated:

"When read as a whole, the instructions given fit defendant's theory of the case, which was that defendant shot Beauchamp because he honestly felt this was necessary to avoid death to himself or his children. In this situation, the court instructed, defendant had no obligation to retreat." *Id.,* p 46.

In the instant case both instructions were given.

Although this issue presents a close question, we are of the opinion that the instructions, read as a whole, correctly stated the law and fit defendant's theory of the case. The defendant claimed that he struck the deceased because he was in immediate fear for his life. Even under the inapplicable instruction, this evidence, if believed, would be sufficient to prove self-defense.

We have thoroughly reviewed defendant's remaining allegations of error and find none which would merit reversal. Defendant's conviction is affirmed.